FILED
2022 Sep-30  PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| KAREN L. CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-02021-SGC |
| | ) | |
| WBRC, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

This is an employment discrimination case.  The plaintiff, Karen L. Church, claims the defendant, WBRC, LLC,[2] discriminated against her based on her race, in violation of 42 U.S.C. § 1981.  (Doc. 1 ).[3]  This memorandum opinion addresses a motion for summary judgment filed by WBRC.  (Doc. 24).  The motion is fully briefed and ripe for adjudication.  (Docs. 25, 30, 33).  As explained below, the motion is due to be granted as to Church's federal claim, which will be dismissed with prejudice; the court will decline to exercise supplemental jurisdiction over her remaining state law claim, which will be dismissed without prejudice.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 14).

[2] Although the defendant states its actual identity is Gray Media Group (Doc. 33 at 1), for the sake of consistency (*see* Doc. 24 at 1), this opinion refers to the defendant as WBRC.

[3] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: Doc. __ at __.

## I.   FACTS[4]

Church worked as a reporter and weekend news anchor at WBRC—a local television station—from December 1, 1998, through December 16, 2015.  (Doc. 30 at 4).  As is customary in the television industry, Church's employment at WBRC was governed by an employment contract.   (*See* Doc. 26-2 at 80; Doc. 26-1 at 25). Church and WBRC negotiated the terms of the contract either annually or biennially. (Doc. 26-1 at 25).  Church's final employment contract (the "Contract") ran from September 20, 2013, through September 19, 2015.  (Doc. 26-2 at 80-85).  Among the terms in the Contract were: (1) provisions allowing WBRC to terminate Church for cause; and (2) a choice of law provision providing for Delaware law.  (*Id.* at 82- 83, 85).[5]  When the Contract expired in September 2015, WBRC did not offer her another contract; WBRC made this decision on September 15, 2015. (*See id.* at 105; Doc. 26-3 at 13).  However, WBRC did not immediately terminate Church when the Contract expired.  Instead, Church and WBRC extended the Contract for six months, until March 20, 2016.  (Doc. 26-2 at 105).  The agreement extended all terms and conditions of the Contract; Church understood March 20, 2016, would be her last day of employment with WBRC.  (*Id.*; Doc. 26-1 at 52).

---

[4] The following facts are undisputed, unless otherwise noted.  They are viewed in the light most favorable to Church, as the non-movant, with Church given the benefit of all reasonable inferences.

[5] The Contract also included a forum selection clause identifying Delaware as the exclusive venue for any litigation concerning the Contract: either the U.S. District Court for the District of Delaware or the Delaware state court located in New Castle County.  (Doc. 26-2 at 85).

At all relevant times, Church—who is White—served as weekend morning news anchor and a general assignment reporter during the week.  (Doc. 26-1 at 14). The chain of command above Church ascended from: (1) executive producer (Tyson Watwood and Lantz Croft); (2) assistant news director (Shannon Maze); (3) news director (James Finch); to (4) general manager (Collin Gaston).  (*See* Doc. 25 at 10-11).  All these WBRC employees are White, except for Finch, who is Black.  (*Id.*). Finch and Church worked together at WBRC for approximately seventeen years; Finch worked as news director from 2007 until the end of 2015, when he was promoted; Finch now works for the company that owns WBRC.  (*Id.*).

WBRC conducts periodic performance reviews for its employees.  (Doc. 26-3 at 12).   On August 12, 2012, Church received an overall evaluation of "Satisfactory."  (Doc. 26-2 at 76).  However, subsequent evaluations in 2013, 2014, and 2015 assigned Church overall scores of "Below Average."  (*Id.* at 86, 95, 100). The record also includes a series of fourteen written and verbal warnings issued to Church by Finch, Maze, and Watwood concerning a variety of work performance issues from September 2012 through October 2015.  (*Id.* at 77-79, 87, 89-94, 96-97, 99, 106).

On December 15, 2015—approximately three months before the Contract extension was set to expire—Church broke a story about a physical altercation at City Hall between Birmingham City Council member Marcus Lundy and the then-

Mayor.   (Doc. 26-1 at 54-55).   Suspecting Lundy had turned himself in to authorities—and wanting WBRC to be the first to report it—Finch dispatched Church to the Birmingham City Jail the following day.  (*Id.* at 55).  When Church arrived at the jail on December 16, 2015, she was unable to speak with officials to confirm or deny Lundy's presence; instead, Church testified she spoke with a bail bondsman who said Lundy was in jail.  (*Id.*).  Church relayed this information to the WBRC newsroom via email at 11:48 a.m.  (Doc. 26-2 at 108).  Soon thereafter, Church spoke on the phone with WBRC producer Angie Bierley; when Bierley asked if Lundy was at the jail, Church responded that she did not know for certain.  (Doc. 26-1 at 56).   When Bierley informed Church that no other outlets were reporting that Lundy was in jail, Church again unsuccessfully attempted to speak with jail officials to confirm his presence.   (*Id.* at 56-57).   Church then spoke a second time to the bail bondsman who told her it was his understanding Lundy was there.  (*Id.*).  Church also spoke with two individuals at the jail whom she believed were Lundy's family members; Church understood them as saying Lundy was in jail, but she hesitated to rely on these statements because they "seemed kind of out of it."  (*Id.* at 56).

Meanwhile, Church and WBRC managers were discussing developments via email.  At 11:56 a.m., Watwood responded to Church's initial email, requesting a mugshot.  (Doc. 26-2 at 109).  At approximately the same time, Church sent another

email to the newsroom stating Lundy was at the jail and she would need to use her phone to shoot video.  (*Id.* at 110).  At 12:03 p.m., Church sent another email confirming Lundy was at the jail—she noted she had been speaking to the bail bondsman and Lundy's family members.  (*Id.* at 111).

Church testified she called WBRC to discuss the situation but was unable to speak with Maze, a producer, or any other manager; instead, she spoke with Melody Le, an administrative assistant.[6]  Church testified she told Le she was hesitant to report that Lundy was at the jail based on a "rumor."  (Doc. 26-1 at 56).  Le said she would relay the information to Maze and placed Church on hold.  (*Id.*).  When Le came back on the line, she told Church to "go with it" and WBRC could issue a retraction if necessary.  (*Id.* at 56, 58).[7]  Church testified she could not hear what Le said once she put her on hold but she interpreted the conversation as though Le was relaying instructions from Maze.  (*Id.* at 56-58).  Church testified she felt rushed to verify the facts and that she would not have run with the story: (1) if she had had more time to verify Lundy's presence; and/or (2) absent Le's instruction to forge ahead.  (*Id.* at 56-59).

---

[6] Le testified she did not speak to Church on the day in question.  (Doc. 26-5 at 9).  For purposes of this motion, the court assumes Church did speak with Le.  Similarly, Finch testified he was unaware of any conversation between Church and Le.  (Doc. 26-3 at 27).

[7] Church acknowledges Le was not a manager or supervisor and had no control over editorial content.  (Doc. 26-1 at 53).  However, Church explained it was not unusual for an assistant such as Le to relay a manager's response to a call from a reporter in the field.  (*Id.* at 58).

In any event, at 12:09 p.m. WBRC ran Church's story that Lundy was being held in the Birmingham Jail. (Doc. 26-2 at 112). Approximately 20 minutes later, Church called Bierley to say her reporting had been mistaken and that Lundy was not in the jail. (*Id.*). Church explained there had been a misunderstanding between her and her sources; the bail bondsman and the family members at the jail were there for a man named Marcus, but not Marcus Lundy. (Doc. 26-1 at 56; *see* Doc. 26-2 at 112). Later that day, Finch and Maze terminated Church. (Doc. 26-1 at 59; Doc. 26-2 at 113). WBRC did not pay Church for the three months remaining on the Contract extension. (*See* Doc. 25 at 33). WBRC issued a retraction regarding the inaccurate report of Lundy's incarceration. (*See* 26-1 at 59).

As "comparators," a legal term addressed more fully in the discussion section below, Church points to several Black WBRC employees: Melanie Posey, Ronda Robinson, and Sarah Verser. (Doc. 30 at 16-18). Posey was a reporter at WBRC (*See id.*). Robinson was a weekend anchor and anchored the regular investigative reporting segment "6 On Your Side." (Doc. 26-1 at 60; Doc. 26-3 at 10). Verser was a regular morning show anchor and an education reporter responsible for a program entitled "What's Right With Our Schools." (Doc. 26-3 at 10).

Church testified that, starting as early as 2012, news stories she pitched were assigned to her proposed comparators. (Doc. 26-1 at 33-34, 61, 68-69). Church testified that while she was required to both shoot and edit her own video footage,

she learned in early 2014 Robinson was not required to shoot and edit footage.  (*Id.* at 62).  Between 2001 and 2016, Robinson received nine warnings[8] from WBRC management, including a final warning in 2015.  (Doc. 29-2 at 3-12).  However, Robinson's performance review was more favorable than Church's last review.  (*Compare* Doc. 29-3 at 2 *with* Doc. 26-2 at 100).  Church further testified her anchoring role was given to Robinson or other Black anchors.  (Doc. 26-1 at 34, 66; *see* Doc. 26-2 at 79).  Robinson also did ten to fifteen holiday promotional shoots in which Church was not allowed to participate.  (Doc. 26-1 at 63).

Church contends Posey was not reprimanded when she was late to work—which was a regular occurrence—but Finch verbally admonished Church if she was even a minute late. (Doc. 26-1 at 33).  According to Church, Posey attended professional conferences which Church was not given the opportunity to attend.  (*Id.* at 64).  This occurred three or four years before Church's termination.  (*Id.*).

Church also testified about three race-based comments made by WBRC employees.  Finch made two comments referencing her race, both well before her termination.[9]  (Doc. 26-1 at 29-30).  First, Church contends Finch, approximately

---

[8] Church credits Robinson with ten warnings.  (Doc. 30 at 17).  However, the record only contains nine.  (Doc. 29-2 at 3-12).  The record also includes an additional document that appears on the same form as the other warnings.  (*Id.* at 7).  However, the form is duplicative of a separate warning issued on May 22, 2014, and states it merely preserves notes from a separate meeting concerning the incident.  (*Id.*; *see id.* at 6) ("This form is not an additional disciplinary action . . . but is to provide witness notes for both meetings as requested . . . .").

[9] Finch denies making these comments, but this opinion assumes he did.  (Doc. 26-3 at 13).

two years before her termination, told her, "You're a white female who just doesn't know how to cover events that don't involve white people." (*Id.* at 29-30). Church also testified that "years" before her termination, Finch told her "We don't need to know what a white female thinks about anything political." (*Id.* at 30). Finally, Church contends Anthony Moore, a photographer, told her he preferred working with Black reporters because they would "get the story better." (*Id.* at 22-23). Church also testified Moore's feedback would have negatively affected her performance reviews. (*Id.* at 25).

WBRC announced its decision to hire Jamiese Price, who is Black, as a general assignment reporter on November 4, 2015, prior to Church's termination. (Doc. 26-2 at 114). After Church's termination, WBRC hired Rick Journey, who is White, as a general assignment reporter. (Doc. 26-1 at 67; Doc. 26-3 at 23). The parties dispute whether Price or Journey replaced Church.

## II.   STANDARD OF REVIEW

Under Rule 56 of the *Federal Rules of Civil Procedure*, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of informing the district court of the basis

for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 248. If the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted). All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   DISCUSSION

The complaint asserts two claims: (1) disparate treatment under 42 U.S.C. § 1981; and (2) breach of contract. (Doc. 1). The claims are addressed in tun.

### A.    § 1981

Section 1981 claims for racial discrimination share "the same requirements of proof and use the same analytical framework" as claims under Title VII. *Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012). Accordingly, cases

discussing the merits of Title VII claims apply equally to Church's § 1981 claim. Church's § 1981 claim asserts disparate treatment based on tangible employment actions: the non-renewal of the Contract and her termination. (*See* Doc. 30 at 20).

As an initial matter, the non-renewal of the Contract is time-barred to the extent Church relies on it as a tangible employment action. Claims under § 1981 are subject to a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). The limitation period on a § 1981 claim is triggered and begins to run at the time of the alleged discriminatory act: "[t]he general rule for discrete job actions, such as discharge, a failure to hire, or a failure to promote, is that the clock starts when the plaintiff receives notice of the adverse job action." *Howell v. Morrison Mgmt. Specs., Inc.*, No. 10-1587, 2013 WL 6568935 (N.D. Ala. Dec. 13, 2013). WBRC declined to extend the Contract on September 15, 2015; Church was terminated on December 16, 2015. Church filed the complaint on December 13, 2019, which was more than four years after the non-renewal of the Contract. (Doc. 1). Accordingly, the only timely tangible employment action here was Church's termination.

A plaintiff can establish a disparate treatment claim with direct or circumstantial evidence. *Burke-Fowler v. Orange Cty., Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006). "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption." *Wilson v. B/E Aerospace,*

*Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal quotation marks and alterations omitted), *abrogated in part on other grounds by Lewis v. Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [a protected characteristic, such as race], constitute direct evidence of discrimination."  *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (internal quotation marks and alterations incorporated) (manager's statement he "didn't want to hire an old pilot" was direct evidence of age discrimination); *see also Dixon v. The Hallmark Cos.*, 627 F.3d 849, 855 (11th Cir. 2010) (noting Eleventh Circuit has held documents stating "Fire Early – he is too old" and "Fire Rollins – she is too old" were direct evidence of age discrimination).  Evidence that suggests, but does not prove, a discriminatory motive is circumstantial evidence.  *Burrell v. Bd. of Trs. of Ga. Mil. Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997).

Here, Church points to the overtly race-based statements by Finch and Moore as direct evidence.  (Doc. 30 at 27-28).  While these statements do negatively reference Church's race, they do not constitute direct evidence of discrimination; none of the statements prove without inference or presumption that Church was terminated because she is White.  *See Steele v. Birmingham Jefferson Civic Ctr. Auth.*, No. 17-2139, 2021 WL 927263, at \*7 (N.D. Ala. *dismissed* March 11, 2021).  Accordingly, even resolving factual disputes in Church's favor by assuming Finch

and Moore made these statements years before her termination, they are circumstantial evidence.

Courts in the Eleventh Circuit evaluating disparate treatment claims for tangible employment actions relying on circumstantial evidence typically use the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Burke-Fowler*, 447 F.3d at 1323. Under this framework, a plaintiff establishes a *prima facie* case of discrimination by showing (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated a similarly situated person outside her protected class (a "comparator") more favorably, and (4) she was qualified to do the job at issue. *Id.* In lieu of a more favorably-treated comparator, a plaintiff may satisfy this *prima facie* requirement by showing replacement by an individual outside her protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). The burden then shifts to the defendant to put forth a legitimate, non-discriminatory reason for the adverse employment action; it then shifts back to the plaintiff to show the proffered reason is pretext for discrimination. *Id.*

However, use of the *McDonnell Douglas* burden-shifting framework "is not the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment

if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted).

### 1.    *Prima Facie Case*

The only requirement of Church's *prima facie* case disputed by the parties is the third: whether WBRC treated a non-White comparator more favorably or replaced her with an employee outside her protected class. (*See* Doc. 25 at 25). For purposes of this opinion, the court assumes without deciding that, construing the facts in the light most favorable to Church, she satisfied her *prima facie* case of discrimination.[10] Thus, the court turns to WBRC's legitimate, non-discriminatory basis for terminating Church and her assertion that it was pretext.

### 2.    *WBRC's Legitimate, Non-Discriminatory Reason*

An employer's burden under the *McDonnell Douglas* framework is one of production, not persuasion. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005); *see also Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) ("the defendant must merely proffer [nondiscriminatory] reasons, not

---

[10] Whether addressing her discrimination claim via comparator evidence or proof she was replaced by someone outside her class makes no difference. Either way, she cannot show  WBRC's legitimate reason for terminating her was pretext for invidious racial discrimination.

prove them."). This burden is "exceedingly light." *Vessels*, 408 F.3d at 769-70 (internal quotation marks omitted). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770 (quoting *Tex. Dept. of Comm. Affs. v. Burdine*, 450 U.S. 248, 254-55 (1981)).

In response to Church's claims, WBRC points to Church's erroneous reporting that Marcus Lundy had been arrested and was being held in the Birmingham City Jail to justify her termination. WBRC also relies on the series of written and verbal warnings it issued to Church, as well as the unsatisfactory performance reviews in the years leading up to the non-renewal of the Contract. These pre-termination warnings and reviews are described in chronological order below.

On September 12, 2012, Maze issued Church a written warning stating she failed to pay attention during the morning meeting and then could not report her assigned news story because she went to the wrong city—Oxford instead of Anniston. (Doc. 26-2 at 77). On October 8, 2012, Finch issued Church a verbal warning in response to an email she sent to the entire newsroom asking other WBRC employees not to change the volume settings on her computer. (*Id.* at 78). Finch's warning noted that during a recent review, she had been instructed to report incidents like this to supervisors—not send "unproductive" emails. (*Id.*).

On January 21, 2013, Maze issued Church a written warning after a disagreement about an anchoring assignment.  (Doc. 26-2 at 79).  The warning recounted that Church was informed she would not be anchoring the news that evening to accommodate schedule shuffling due to illness.  (*Id.*).  Maze's warning stated Church was confused about whether she would be anchoring and that she became upset while discussing the issue with Ronda Robinson—the evening anchor stand-in for that night.  (*Id.*).  Maze instructed Church she had been informed of the scheduling change and advised her to bring any future similar concerns to management—not co-workers.  (*Id.*).

On September 24, 2013, Church received a "below average" overall evaluation from Maze, Croft, and Robert Stevenson[11].  (Doc. 26-2 at 86; *see id.* at 87, Doc. 26-1 at 36-37).  The evaluation, which largely reported Church's performance was average to below average, noted her managers were concerned about the "lack of year over year improvement."  (Doc. 26-2 at 86).  On the same day, Finch issued a verbal warning to Church, based on the below average evaluation.  (*Id.* at 87).  The warning largely reiterated the evaluation's recommended areas for improvement.  (*Id.*).

On October 9, 2013, Maze issued Church a written warning for an on-air reporting error.  (Doc. 26-2 at 89).  Specifically, Church reported a woman faced

---

[11] Stevenson was a producer at WBRC.  (Doc. 26-1 at 36).

extradition on murder charges, when in fact she was extradited on forgery charges. (*Id.*). The warning stated that although Church had realized the mistake—the extradited woman was suspected of murder but had not been charged—she failed to notify the producer, resulting in the inaccurate on-air reporting. (*Id.*). On October 20, 2013, Watwood issued Church a verbal warning for failing to provide written content to support a fast-developing story following the crash of a UPS plane on approach to Birmingham. (*Id.* at 90).

On November 12, 2013, Finch issued Church a verbal warning for what he described as poor on-air performance in reporting about a teenager accused of stabbing his mother to death. (Doc. 26-2 at 91). On November 25, 2013, Maze issued Church a verbal warning after she sent an email to management regarding instructions she received to avoid working overtime hours. (*Id.* at 92).

On March 18, 2014, Croft issued Church a verbal warning for submitting unusable video footage ten days prior. (Doc. 26-2 at 93). The warning noted Croft had continued to monitor Church's work and that the footage she submitted subsequently had been satisfactory. (*Id.*). On August 14, 2014, Maze issued Church a written warning for an on-air reporting error. (*Id.* at 94). Specifically, Church reported on a type of knee surgery and stated that a local surgeon was one of the few to perform it. (*Id.*). The warning stated that, after WBRC received calls and emails stating the surgery was common and was performed by multiple local surgeons,

Church acknowledged she did not fact-check her assertion as to the frequency of the operation.  (*Id.*).

On September 29, 2014, Maze, Watwood, and Drew Dover[12] evaluated Church's performance as "below average."  (Doc. 26-2 at 95).  The evaluation reflected poor to average performance across all areas assessed.  (*Id.*).  The same day, Maze issued a written warning reiterating the below average evaluation score.  (*Id.* at 96).  According to the warning, at the end of the meeting, Church stated the upcoming year would be her last year working at WBRC.  (*Id.*).

On January 14, 2015, Maze issued Church a final, written warning based on multiple on-air errors she made in reporting a story about an abandoned baby.  (Doc. 26-2 at 97).  The final warning noted that any additional unsatisfactory performance would result in immediate termination.  (*Id.*).   On February 16, 2015, Maze issued Church a verbal warning for poor on-air performance during a live-shoot regarding road conditions in Cullman.  (*Id.* at 99).  The warning states Church called attention to a malfunctioning thermometer and referred to weather conditions as "pleasant." (*Id.*).

On September 15, 2015, Maze and Watwood completed an evaluation, again rating Church's performance as below average.  (Doc. 26-2 at 100).  Following this third, consecutive negative review, WBRC chose not to renew Church's

---

[12] Dover was an online content producer for WBRC.  (Doc. 26-1 at 46).

employment, instead opting to extend the Contract for six months.  (*Id.* at 105).  On October 13, 2015, Finch issued Church a written warning for an email to Watwood concerning her request to use vacation time; the warning described the email as disrespectful and verging on insubordinate.  (*Id.* at 106).  The warning also noted any further unsatisfactory performance would result in discipline, "up to and including discharge prior to March 20."  (*Id.*).  As already noted in the undisputed facts section, WBRC terminated Church on December 16, 2015, following her erroneous reporting that Marcus Lundy was jailed.

WBRC contends it terminated Church—who had a history of performance issues documented by warnings and her performance reviews—due to on-air errors caused by her reporting on Marcus Lundy.  (Doc. 25 at 28; *see* Doc. 26-3 at 14).[13] This satisfies WBRC's light burden to articulate a legitimate, non-discriminatory reason for terminating Church.

### 3.   *Church's Failure to Demonstrate Pretext*

In response to WBRC's arguments, Church takes issues with the facts underlying each disciplinary warning and poor performance review.  (Doc. 30 at 7-14, 30).  Before turning to her specific arguments, it is worth reiterating that, aside from Finch, all of Church's supervisors and the relevant decision-makers at WBRC

---

[13] Finch testified the non-renewal decision was driven by Church's poor evaluations and repeated warnings.  (Doc. 26-3 at 14).  Finch specified Church's termination was due to the Lundy reporting error.  (*Id.*).

were White; only Finch, who is Black, was of a different race than Church.  Of the fourteen written and verbal warnings Church received, only four were issued by Finch.  (Doc. 26-2 at 78, 87, 91, 106).  The remaining ten warnings, as well as the three, below-average performance reviews, were issued by Church's White supervisors.  Church contends Finch, whom she compared to North Korean dictator Kim Jong-un, was such a dominant force at WBRC that all the other managers did his bidding.  (*E.g.* Doc. 26-1 at 34-35).  Accordingly, as Church would have it, each warning and poor performance review she received—regardless who issued it—was infected with Finch's racial animus.  (*Id.* at 32, 40-41; *see* Doc. 30 at 7).

As an initial matter, it appears the parties' arguments concerning all of the negative performance reviews and warnings are essentially irrelevant to the pretext inquiry.  As previously discussed, Church's termination is the only timely, tangible employment action.  WBRC's decision to extend, rather than renew, the Contract occurred on September 15, 2015; this was more than four years before the complaint was filed here on December 13, 2019.  Accordingly, the time to review WBRC's non-renewal of the Contract expired nearly three months before this lawsuit was filed.  Moreover, aside from the October 13, 2015 written warning, all of the negative performance reviews and warnings were issued before WBRC decided not to renew the Contract.  Logically, these earlier performance reviews and warnings inform WBRC's time-barred, non-renewal decision, not the timely termination decision.

19

Indeed, the stated reason for WBRC's termination decision was driven by the reporting error regarding Lundy.  (Doc. 26-3 at 14).  Thus, the one warning Church received after the non-renewal of the Contract—concerning a disrespectful email she sent—also appears to have had little to no impact on the termination decision.  Nevertheless, the court will address the parties' arguments regarding the warnings and negative reviews to the extent they could inform the pretext inquiry.

"The inquiry into pretext centers on the employer's beliefs, not the employee's . . . ."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Id.*; *see also Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).  Moreover, "[i]t is a well-settled principle of employment law that in investigating employee misconduct and reaching an employment decision, employers are entitled to make credibility decisions, and [a court's] inquiry is limited

to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so." *Leach v. State Farm Mut. Auto. Ins. Co.*, 431 F. App'x 771, 777 (11th Cir. 2011). In short, "[an] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated in part on other grounds by Lewis*, 918 F.3d at 1213, 1218, 1224-29. Thus, to meet her burden at the third step of the *McDonnell Douglas* framework, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (internal quotation marks omitted).

Regarding the warnings and poor performance reviews, Church contends they "were either false or designed by Finch as a pretextual basis for discipline that [WBRC] could ultimately use as justification for her termination." (Doc. 30 at 30). The warnings issued by Finch include: (1) the October 8, 2012 verbal warning concerning the department-wide email Church sent regarding the volume settings on her computer (Doc. 26-2 at 78); (2) the September 25, 2013 verbal warning summarizing the critique and areas for improvement from the first "below average"

21

performance evaluation completed by other WRBC managers (*Id.* at 87); (3) the November 12, 2013 verbal warning for poor on-air performance in reporting about a teenager accused of stabbing his mother to death (*Id.* at 91); and (4) the October 13, 2015 written warning for a supposedly disrespectful email Church sent to Watwood concerning her request to use vacation time. (*Id.* at 106).

Church argues with the legitimacy of each of these warnings issued by Finch, contending: (1) the October 8, 2012 verbal warning was a "petty way to discipline" her and assure she could not complete her work due to the time she spent changing the volume settings on her computer; (2) the September 25, 2013 verbal warning merely repeated negative aspects of her performance review and was a "petty attempt by Finch to pile on pretextual disciplinary records for discriminatory reasons"; (3) the incident giving rise to the November 12, 2013 verbal warning was the fault of Moore—the photographer—and the warning was wrongly issued; and (4) she has no memory of receiving the October 13, 2015 warning and she disputes unidentified portions of the warning. (Doc. 30 at 7, 9, 11, 14).

Church's arguments regarding the warnings Finch issued are doomed attempts to "recast [WBRC's] proffered nondiscriminatory reasons or substitute [her] business judgment for that of" WBRC and/or quarrel with the wisdom of issuing the

warnings.  *Chapman*, 229 F.3d at 1030; *See Alvarez*, 610 F.3d at 1266.[14]  To the extent Church complains WBRC rejected her version of events in issuing any warnings, WBRC was allowed to do so.  *Leach*, 431 F. App'x at 777 ("in investigating employee misconduct . . . employers are entitled to make credibility decisions").  Moreover, Church has not presented evidence showing WBRC's beliefs justifying any warning[15] were unreasonable.  *See id.*  (a court's "inquiry is limited to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so").  Regardless of the substantive merit of any of Finch's warnings, Church has offered no evidence—beyond her testimony regarding her suspicions—that the warnings were motivated by racially discriminatory animus.  *Sturniolo v. Sheaffer, Eaton, Inc.,* 15 F.3d 1023, 1026 (11th Cir. 1994) (plaintiff's unsupported suspicion of discrimination insufficient to show pretext).

Church's arguments regarding the warnings and negative performance reviews issued by White WBRC managers fare no better.  Again, Church posits Finch's domineering personality led WBRC's White managers to do his bidding.  Accordingly, Church contends any negative review or warning she received while

---

[14] To the extent Church relies on Facebook messages (Doc. 29-1) showing viewers' support for her work and dismay at her termination, this evidence does not show pretext.  *Alvarez*, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs . . . .").

[15]  Again, none of these warnings resulted in any timely, tangible employment action.

at WBRC was a product of Finch's racially discriminatory animus.  The problem for Church is that, beyond her own suppositions, she has not submitted any evidence to support this theory of racial discrimination by proxy.

Turning to Church's termination—the only timely tangible employment action here—WBRC's stated reason was her inaccurate reporting that Marcus Lundy was in jail.  In response to WBRC's stated reason, Church argues: (1) Finch pressured her to get the story out quickly; and (2) she only confirmed Lundy's presence at the jail after the telephone conversation with Melody Le, during which Le said to run with the story with the possibility of issuing a retraction if necessary. (Doc. 30 at 15-16).  First, any pressure Finch exerted to break the story does not squarely address and rebut WBRC's termination justification—her inaccurate reporting. *See Chapman*, 229 F.3d at 1030.  Rather, this argument merely attempts to recast WBRC's nondiscriminatory reason and argue it was unwise or incorrect. This is insufficient to show pretext.  *See id.*

Regarding the telephone conversation with Le, Church relies on it to show it was unreasonable to terminate her for running with a story at the behest of her supervisors.  (Doc. 30 at 15).  According to Church's testimony, she called the WBRC newsroom to speak with Maze concerning uncertainty whether Lundy was jailed.  Le answered the phone and said that Maze was too busy to talk; instead, Le

told Church she would relay the information to Maze.[16]  Church testified she heard Le call Maze's name before placing the call on hold.  When Le rejoined the line, she told Church to run with the story.[17]  (Doc. 26-1 at 58).  Even accepting Church's version of events, there is no evidence showing Maze and/or Finch were unreasonable in believing Church had made a reporting error requiring retraction in a high-profile news story.  *See Alvarez,* 610 F.3d at 1266 (pretext focuses "on the employer's beliefs, not the employee's"); *Leach*, 431 F. App'x at 777.  Moreover, even if WBRC fired Church for "a bad reason, a reason based on erroneous facts, or for no reason at all," it is only liable under § 1981 if it fired her for "a discriminatory reason."  *Nix*, 738 F.2d at 1187.  There is no evidence to support Church's burden in this regard.

Next, to the extent Church may rely on comparator evidence to show pretext, her attempts fail.  First, Church points to Ronda Robinson as being treated more favorably regarding discipline.  (Doc. 30 at 16).  Specifically, Church notes

---

[16] Church contends Le's testimony that this conversation never occurred creates a genuine issue of material fact necessitating denial of summary judgment.  (Doc. 30 at 15, n.12).  However, for purposes of this opinion, the court assumes Church's version of events is true and that the conversation with Le occurred.

[17] Church testified to three slightly different versions of this conversation.  First, Church testified Le said, "That's okay.  The producers told me that we can just retract it later if necessary."  (Doc. 26-1 at 56).  On further questioning, Church testified when Le took her off hold she said, "That's what [Maze] told me, so just go with it."  (*Id.*).  Still later, Church explicitly clarified that Le did not name Maze as giving the instruction.  (*Id.* at 58) (testifying Le returned to the line and said "Just go with it, and we can retract it later," but specifying that Le did not attribute the instruction to Maze).

Robinson received nine (or ten) warnings during her employment but received better performance reviews than Church.  (*Id.* at 17).  As discussed above, any disparities in performance reviews could be probative of the now time-barred non-renewal of the Contract—but not the timely, relevant decision to terminate Church.  However, even if comparisons of performance reviews were somehow relevant to the pretext inquiry here, they do not show pretext.  Robinson received nine warnings over a fifteen-year period.  (Doc. 29-2 at 3-12).  Meanwhile, Church received fourteen warnings over a three-year period.  Similarly, none of Robinson's warnings were issued due to inaccurate reporting or poor on-air performance.  Accordingly, regarding disciplinary warnings, Robinson and Church are not "similarly situated in all material respects," either as to the frequency or nature of the warnings.  *Lewis*, 918 F.3d at 1224.

Church also compares WBRC's treatment of Robinson in other respects. Church contends: (1) at times her anchoring role was taken from her and given to Robinson; (2) Robinson, unlike Church, was not required to both shoot and edit her own material; and (3) Robinson was chosen to participate in 10-15 holiday promotional shoots for which Church was not chosen.  (Doc. 30 at 16-17).  Before addressing each grievance, it must be noted that none of this evidence squarely addresses, much less rebuts, WBRC's justification for Church's termination—her inaccurate reporting regarding Lundy.  That Church was required to edit and shoot

her own video could tangentially show WBRC made it more difficult for her to perform her job relative to Robinson, thus, potentially constituting, or at least contributing to, an adverse employment action.  However, again, that evidence is probative—if at all—of WBRC's non-renewal decision, not Church's termination.

Next, while Church's briefing does not allege how many times her anchoring role was given to Robinson, the evidence she cites shows it happened twice.  First, after the April 2011 tornado outbreak, Finch dispatched Church to report on-location in Tuscaloosa, giving Robinson her anchoring role for the day.  (Doc. 26-1 at 66). Next, Church had been scheduled to anchor the night of January 21, 2013; however, due to staffing issues caused by illness, WBRC instead moved Church to the daytime anchor spot and had Robinson anchor that evening.  (*See id.* at 34; Doc. 26-2 at 79). Robinson being assigned to Church's anchoring position on two occasions does not show her termination years later for inaccurate reporting was pretext for racial discrimination.  Similarly, featuring Robinson in holiday promotions instead of Church is irrelevant to the pretext inquiry here.

Other comparator evidence Church relies on to show pretext is similarly irrelevant, including: (1) stories she pitched being assigned to Sarah Verser, Ronda Robinson, and Melanie Posey; (2) Finch's verbal admonition of Church for being even a minute late, while ignoring Posey's recurrent tardiness; and (3) sending Posey—not Church—to a professional conference years before Church's

termination.   (Doc. 26-1 at 64; 61).   As with all the pretext evidence already discussed, none of the foregoing supports Church's assertion that WBRC's stated reason for terminating her—the inaccurate reporting regarding Lundy—was false, much less that racial discrimination was the real motivator.

Finally, what remains is Church's testimony that Finch made a total of two negative comments regarding her race, both years before her termination.[18]  Church testified that on two different occasions,  both years before her termination, Finch said: (1) she was "a white female who just doesn't know how to cover events that don't involve white people"; and (2) "We don't need to know what a white female thinks about anything political."  Even taking Church's word that Finch made these comments, two remarks over a seventeen-year work relationship that negatively referenced Church's race do not show her termination, years later, was motivated by racial animus.

For the foregoing reasons, Church's § 1981 claim does not survive summary judgment under the *McDonnell Douglas* framework.

4.    *No Convincing Mosaic of Circumstantial Evidence*

Next, to show a convincing mosaic of circumstantial evidence of

---

[18] Church also alleges a photographer, Anthony Moore, once told her  he preferred Black reporters because they would "get the story better."  Church further testified that Moore assisted in conducting her performance reviews, so his discriminatory attitude could have negatively affected her evaluations.  This might be relevant if the non-renewal of the Contract were timely here.  As it is, Moore's statements are irrelevant to Church's timely termination claim.

discrimination, Church relies on Finch's and Moore's anti-White statements, together with the other evidence already discussed. (Doc. 30 at 27-30).[19] For the same reasons already discussed, this evidence, whether considered separately or collectively, is insufficient to constitute a convincing mosaic of discrimination.

Accordingly, there are no genuine issues of material fact regarding Church's § 1981 claim, and WBRC is entitled to judgment as a matter of law.

**B.  <u>Breach of Contract</u>**

The parties' arguments concerning breach of the Contract mirror the arguments already discussed. As WBRC would have it, Church's reporting error provided cause for it to terminate the Contract three months early; meanwhile, Church contends WBRC's discriminatory firing shows it breached the Contract. (Doc. 25 at 31-33; Doc. 30 at 30-31). Neither party applies Delaware law to the specific facts of this case. Also absent from the briefing is any discussion of the impact of the Contract's forum selection clause, which identifies Delaware as the exclusive forum for any litigation over the Contract. As explained below, the court need not muddle its way through an analysis of this claim.

Church's complaint explicitly invokes federal subject matter jurisdiction under §§ 1331 and 1343. (Doc. 1). Aside from not invoking this court's diversity

---

[19] Here, Church again relies on evidence bearing on the time-barred non-renewal decision. (Doc. 30 at 28-29).

jurisdiction, the complaint does not allege facts to support it.  Because the § 1981 claims are due to be dismissed, the court declines to exercise supplemental jurisdiction over the state law claim for breach of contract.  28 U.S.C. § 1367(c)(3).  A federal district court may exercise supplemental jurisdiction over state law claims that are so related to claims in an action over which it has original jurisdiction as to "form part of the same case or controversy under Article III of the United States Constitution."  § 1367(a).  However, federal law permits a district court to decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  When determining whether to decline the exercise of supplemental jurisdiction under § 1367(c)(3), a court should consider judicial economy, convenience, fairness to litigants, and comity.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349-50 (1988).

As reflected by the volume of the briefing on the respective issues, this is an employment discrimination case that happens to involve an employment contract.  Accordingly, judicial economy would not be significantly impaired by declining the exercise of supplemental jurisdiction.  Regarding fairness, the plaintiff may reassert her state law claim in an appropriate forum.[20]  While the first two factors are fairly neutral, comity weighs heavily in favor of declining supplemental jurisdiction here,

---

[20] The statute of limitations for any claim asserted under § 1367(a) is tolled while the claim is pending and for a period of thirty days after dismissal unless state law provides for a longer tolling period.  § 1367(d).

where the Contract calls for application of Delaware law by a court sitting in Delaware.  *See Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law."); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (encouraging federal courts to dismiss state law claims when federal claims have been dismissed prior to trial).

## IV.   CONCLUSION

For all the foregoing reasons, WBRC's motion for summary judgment is due to be granted as to Church's § 1981 claim, which is due to be dismissed with prejudice.  Because Church's only federal claim fails on the merits, the court declines to exercise supplemental jurisdiction of the claim for breach of contract; that claim will be dismissed without prejudice.

A separate order will be entered.

**DONE** this 30th day of September, 2022.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE